And Joe, the only case that came down to me is the estate of Portia and not the Bennetts, which is a separate pile. Can you go get it? Yes, sure. Oh, wait, this is his case, isn't it? No, no, Eric, let Joe go and you stay for this. It's on the second shelf. Michael, would you ask one of them to come back in? Both disappeared? Tell Eric to come back in. Oh, you stay and let Eric go get it. Thank you, Eric. Now, these cases, before we start, and for your time, these cases have not been consolidated. Look, there's some question as to whether the cases were consolidated or not. At first we were told the cases weren't consolidated. I asked the clerk to look into it, and there is apparently a consolidation order. Would somebody enlighten me as to your understanding? You can come up to the podium. I'll jump right in, Your Honor. My name is Terri Heinbaugh, and I represent the estate of Portia Bennetts. These cases really do arise while they arise out of the same pattern. They really involve two very separate areas of the law and two different arguments. My only question is the administrative one. Have the cases been consolidated? I believe that they were consolidated ultimately, but for purposes of argument, they're really very separate. Well, we will allow plaintiff appellants counsel in both cases. We listed that for each of them, 10 minutes to each of you, and you can come back because you're going to start. We didn't know, and the clerk's office sent me yesterday a caption that suggests that there was some kind of consolidation, although the legal issues are not different. Well, you can tell us that. Okay, so we're going to hear now, and you represent the estate or the Bennetts? The estate. You represent the estate. If I could reserve three minutes? Yeah, well, you both can't. I mean, decide among yourselves who will reserve three minutes. Well, since they're different, maybe we ought to... No, but we don't let people jump up and down. But this is a different type of situation. Well, I'm not going to do that, but do you want three minutes each? I'm going to give you both just seven minutes. You want to have, like, three minutes for one, so they are separate facts that we will be on. All right. It's against my better judgment, but Judge Roth is a good friend, not because he's a colleague. I will do it. Thanks, Judge. Okay. Thank you. You're welcome. I'm getting rid of Michael. Do you have that then? Seven minutes? Seven minutes? Three of a bottle. Okay. I'm sure you're all very familiar with the really very horrendous facts of this case and what brought us here today, so I'm not going to spend any time going over those. I'm actually going to jump right in to the fourth prong of the estate-created danger test in order to facilitate my seven minutes. The district court held in this case that we were unable or the state was unable to show that there was an affirmative act by any of the defendants. It was our position. In the city. In the city, yes. It's our position that, indeed, there was affirmative acts. Mr. Maiden, who was the social worker for DHS, acted affirmatively. When the assignment came to DHS, the hotline call was made. It was taken into his office, and the assignment was actually given to another social worker initially. Mr. Maiden made the affirmative choice and made the affirmative action of requesting that he be given that assignment as opposed to the assignment that he had originally been given. By doing that, he did it for his own self-interest. It was geographically more convenient for him to take this assignment opposed to the one that he wanted. However, by doing that, he misused his authority. He had authority to do this, to take an assignment. He misused the authority because he turned around, and instead of doing what he was mandated in a non-discretionary manner to do, and that is to go and make contact with the child. Let's assume he lied. Let's assume he didn't go and check on her. He lied. But she wasn't in custody. Don't our cases say that in order to be able to show a state-related danger, state-created danger, you have to be in custody? Isn't that the issue? No, those are the Ducheney line of cases. Poor Joshua. Poor Joshua, right. They really are very distinct. Are you talking about the police chase line of cases? Well, no. I'm talking about the Ducheney line of cases, the special relationship type of cases where you've got an individual who's in custody, like was alleged in poor Joshua's case. That is a very distinct line of cases where, indeed, custody is required as an element. However, this is a separate line of cases that does not require custody, and that's why there are these four prongs to the state-created danger test. What line of cases doesn't require custody? What line of cases does not require custody? You said there's a line of cases that does not require custody. I thought the cases all require custody. Well, no. We had Morris v. Lower Marion School District. That actor, we also have Riveras, which was an EMT v. City of Passaic, where EMTs were involved. Well, that's why I said the police chase type. Well, some of them, then you get into the Bright, which are police chase cases. But you have a whole variety of school, some school cases. You've got some EMT cases. Are they Section 1993 cases? Yes, yes, ma'am. But there is a direct act, but it has to shock the conscience, doesn't it? Well, there's actually, when you look at it, there's DeShaney. There is the Morris and Bright line of cases, ending in Bright. And then there is the Lewis line of cases. Now, the Lewis line of cases, which we argued separately as a distinct theory of liability, states that under this theory, if the state actor's actions shock the conscience, slash, are arbitrary and capricious, and there is a right implicated, such as the right to life, which is implicated here, that all is used to be shown as legal. But those are cases, aren't they, where you have some action by the state actor? We do have action by the state actor. No, you have inaction. You don't have action here. You have inaction. In other words, obviously, if a city of Philadelphia police vehicle hits my car and injures me, I have an action. But you don't need a state-created danger theory to get recovery in that kind of case. And I don't think Ms. Istvan would deny that. Now, you have to take out, then, of your precedent any cases where the city official actor did something. And so the cases that you're talking about, like Judge Roth said, the police chase cases, they did something. That's not an ordinary negligence or gross negligence case. Agreed. And I want to make it very, very clear that it's keeping very separate the state-created danger line of cases from the conscious, shocking, arbitrary, and capricious line of cases. Well, yeah, but that's the standard that you use when there has been action by a state actor. If I may say, Your Honor, with regard to the Lewis line of conscious, shocking cases, there is no requirement under Lewis and that line of cases that there be an affirmative act. I cite Collins v. City of Harker Heights, Fagan v. City of Vineland. All of those state that when you deal with the conscious, shocking Lewis line of cases, you need not show an affirmative act. However, setting that even aside, going back to the state-created danger line of cases, I think we can assert that there was an affirmative act. We have several affirmative acts. We have his requesting to take the case. We have his making the decision, which a decision and the act of making a decision not to go to a house is an affirmative act. It's not that he forgot to go to the house. He decided for self-interest or potentially criminal reasons not to go. Let's say he lied. Whatever happened to him, by the way? He retired. Yeah, that's what I think. Before he was. Before he was. And he was never charged criminally, ultimately, though he took the Fifth Amendment when it was deposed to him. Yeah, yeah. Those are decisions that he made. Those are affirmative acts to take the case, to choose not to go out to the house, despite the fact he knew he had a nondiscretionary responsibility, in this case, to contact, make contact and investigate that situation. It was not that he had to make a, well, maybe I should, maybe I shouldn't. The law was clear. When he receives a hotline report, his taking the assignment away from someone who would have gone out to the house Well, we don't know if someone would have gone or wouldn't have gone. Well, we're certainly hoping that another social worker would have done their job and would have gone to the house. Well, given the background of DHS, I'm not so sure you can assume that. Okay. The record is not very complimentary. I have to agree with that, Your Honor. Or to some of the other social workers. That's right. Okay. Well, I think we understand your position. Thank you, Your Honor. Thank you. May it please the Court, my name is Christopher Carlton and I represent appellants Alexis Bennett, Aliyah Bennett and Priscilla Bennett, who are the three surviving Bennett sisters. Before we go any further, let me identify our claim, because it is a separate claim and it relates to a completely different set of facts. It doesn't relate to the facts in 2003. It relates to a dependency court hearing that took place on April 18, 2000. Now, prior to that hearing, the Bennett sisters, the girls I represent, were subject to dependency court petition, which had been deferred, plus DHS supervision. The mother was living with the girls in a shelter. She ran off with the girls. The Salvation Army. The Salvation Army shelter. I read this record. Go ahead. Okay. Our claim is that, let me jump to the hearing. At the hearing, our claim is that DHS deliberately lied to the court and to the girls' attorney. The girls' attorney was Anthony Turnell, who worked for the Child Advocate Unit at the Public Defender's Office. And we posit that this is not an omission case and this is not a mere assurance case. This is an actual misrepresentation to a court with the intention of obtaining dismissal of the case, knowing that the natural consequences of getting dismissal of the case will be that a private source of rescue, i.e., the Child Advocate Unit, will no longer be looking for these kids. Were they looking for them in the first place? I mean, they had been involved in the case. They had objected to closing the case six months earlier and made no effort to find the children. Now, if you were going to say the rescue was prevented, it looks like a pretty unlikely rescuer that you have in mind. That's what concerns me. Your Honor, that was the decision that Judge Schiller made. It was a factual determination. He said, wait a minute, if they kept this case open, they wouldn't have looked for the kids because they never looked before. And, in fact, they agreed to close the case. Nobody comes out of this smelling it. No, Your Honor. Nobody. And we are very cognizant of that. But the question is what can we do under the law? Your Honor, the jury could have reached a different conclusion. The jury could have said, wait a minute, just because they didn't— Under what theory? do you have that would allow the case to proceed? We're relying on the case Nett v. Tedder. That is the case that's involved the couple of drunks coming home from a bar. The police stop them, tell the husband, we've got it, you go on ahead, and they hold the wife. That's the one case, that on the road. Right, they let the wife go and the wife ends up in a ditch. And, in that case, she sustains an anoxic brain injury. That is the case we rely on because that is a case where they change the course of events. They didn't have anybody in custody. We posit that we don't know the entire situation. Well, I think if you read that case, our later cases say she was technically in their protective custody. She would have been detained by them. That's right. And then they left her. They let her go. I mean, that's the only case that I know of in this court, in a long line of cases, because I was in some of them. And this is not really the same. But that was not a custodial case because the complaint wasn't that she was abused while she was in their custody. It's not a custodial case because all our cases say you have to be in prison or in custody in order to be able to sue. And as much as we would like to help you, I mean, you know, come out and you'll hear, I don't know how we can, as a legal matter, distinguish this case from the long line. Like the police come to the house of the woman because a neighbor called out and they don't break open the door. A Penn graduate student. And they don't break open the door and she ends up being murdered. And the courts held, well, it's not a case where you can hold the police or the city liable. Your Honor, there is a constitutional duty to protect members of society or to provide them welfare or help. But at the same time, the state cannot indirectly violate somebody's 14th Amendment rights. They can't do it directly and they can't do it through a proxy. By taking action that they know will have the end result that somebody's rights will be violated by a third party. And in this case, they took action that they knew would end a potential chance that a third party would rescue these girls. And it's a factual determination as to whether a jury could find that had the case stayed open, there was a real chance that the child advocate might have gone out and looked for those kids. Because he did have a duty under the law to look for them. But they did not want to close the case to prevent CAU from looking for the kids. They wanted to close the case so they themselves wouldn't have to work on it. That's true. Where you prevent someone else from helping, that cause of action, I believe, is only recognized where it is with the intent to prevent that other person from assisting. Whereas here, the intent really was because they didn't want to bother with the case themselves. Your Honor, I do not believe or we do not believe that you have to prove that the intention was to prevent help. It was in the Nett v. Taylor case. The cops didn't intend for that consequence. They didn't intend to leave the wife unprotected. It just was a natural consequence of their action, and they should have foreseen that that was a natural consequence of their actions. They didn't intend for Mrs. Nett to end up in a ditch. This is not an assurance case either. This is not a case where somebody gave an expression of an intent to help that they didn't follow through with. This was an expression of a material fact as it existed at that time. And the record is clear that there was a lie because they found out the day before that this family was getting welfare benefits. They knew they had a lead. They had new information. They should have come into court and said, Stop. This family can be found because we just found out that they're getting benefits. So are you saying that we should establish a rule that when DHS gives up on a case and tells the court they can close the file, they can be held liable if, in fact, something happens to a member of that family? What is the bright-line rule that you would have us adopt? If you were writing the opinion, what would you say would be the legal principle? That DHS cannot lie to the dependency court to obtain closure of a file on the grounds that the family could not be found when it knew the family could be found. They cannot use a deliberate misrepresentation to obtain closure of a dependency court file. Well, we'll hear from the city and have a response to this. Thank you. Okay? I can just imagine the number of cases that we would have if we established that. Judge Roberts, you've been quiet. Did you have any questions? No, thank you. Okay. Thank you, Your Honor. My name is Janice Twain, and I represent the city in this matter. I have been waiting for you. While I was working on this case, the Philadelphia Inquirer had a headline. It had a headline that said, and that was Thursday, June 14th, so you know when I was working on the case, how DHS failed a child in danger. And that was a nine-month-old boy who ended up drowned because the mother was busy on the phone. The mother, whom they should have known, could not have taken care of him. We see case after case like this in the newspapers, just in our circuit, leave aside everyone else, how DHS just fails constantly. Why shouldn't this court finally step in and say, it's time to hold the city liable? Well, Your Honor, I'd have two responses to that. First of all, newspaper articles, of course, are not part of the court record. No, but we can take judicial notice of that which is in the newspaper. And the fact is not that it happened, but that it happens continuously, and you know it. And second, it's not something that, that case is an example, and this case is an example as well, it's not something that's of constitutional magnitude. And I know that it's a case that's just like DeShaney. I mean, that's a case, frankly, with conscience-shocking behavior on the part of the social worker just ignoring her duty to rescue that child in the face of obvious signs of danger. And yet the court said that's not the court's job. It's not something, rescue from private danger is not something that's a constitutional duty. Unless the court steps in sooner or later, it's going to continue. Why shouldn't the court say it's time to say, yes, these people have a right to some protection from the authorities? Well, Judge Schlimmer, I'd respectfully say that you'd have to get out from under DeShaney, and I'd invite your attention to DeShaney where the court says there is an impulse to help poor Joshua, but we're going to leave it to, sometimes it's left to the democratic political processes, to legislatures, to mayors, which I submit is what's happening in this case. There's blue ribbon panels. And they never, they come out and they say it's terrible. They shake their hands and they shake their heads and they do a couple things, and yet these children end up dying. And the democratic political process, I'd say, is responding to that and responding quite aggressively. Well, obviously it hasn't responded very well. Well, that's something that's in the process of taking place with respect to what you're reading in the newspaper, and I submit that the record here demonstrates that when the social worker's efforts came to Commissioner Martinez's attention with respect to their search procedures, that she did take aggressive action and changed what they did and did, in fact, find children when they went back and reexamined cases. But to go back to constitutional issues, I'd like to start with the estate and just touch for a minute on municipal liability because that's an issue that we raised in our brief that went unrebutted by the estate. And in this case, there was no proof that there were prior violations of the 24-hour distress call deadline that were on record such that DHS should have been on notice that there was a problem and taken action to fix it in such that it could be inferred that we condone what Mr. Maiden did. There's no evidence of that in the record. In the district court, at pages 28A to 31A in the record, Ms. Heimbaugh made a couple of contentions to try to refute our municipal liability argument. She pointed out that our manual doesn't specifically require social workers to ensure that supervisors to ensure that this particular deadline is met, but my answer to that would be that the manual generally requires at page 109A that supervisors ensure that social workers are meeting their deadlines on distress calls. And further, it's implicit in a supervisor's mandate to check and make sure that those deadlines are met. And absent a pattern of noncompliance by social workers telling us that our current policy is a problem, that's simply not enough to make out a municipal liability claim in this case. With respect to the constitutional claim, I have to confess I've always been mystified by Ms. Heimbaugh's argument that DeShaney somehow doesn't apply to the state-created danger case. The state-created danger theory arises out of DeShaney, and you have to prove an affirmative act. And DeShaney, Bright v. Westmoreland County, and, of course, the most recent pronouncement of the Yee v. USA case, which is 484 F. 3rd 634, I'm mentioning something that's not cited in my brief simply because it was decided. Since our brief came out very recently. But those three cases, I would submit, define an affirmative act as something, first of all, that has to change the situation, not just a failure to rescue, but it also has to change the situation and make it more dangerous. And second, the affirmative act has to be something akin to a restriction of liberty. And the acts that Ms. Heimbaugh discusses, none of them are even arguably affirmative. Most of them, almost all of them, are things that wouldn't change the situation that simply result in DHS's failure to rescue. They don't prevent a third party from coming in. How do you distinguish our case in these? With respect to the state-created danger case or with respect to this case? With respect to either case. You represent the appellee in both. Well, in Knight, both of those elements were present. In Knight, you had Mr. Knight there and the police sent him away, detained both of them, then sent her away. So you had the change in the situation, you made her more vulnerable to certain danger because you had a husband there who claimed that he was certain to take her home. You don't have that in either of those cases, and you certainly don't have it in the Alexis Bennett case. And I'd submit that that's the easiest way to resolve that case, is that it's completely speculative. There's no evidence on the record that the child advocate would have rescued, would have found the children, whereas in the Knight case, it's quite easy to infer that Mr. Knight would have continued to walk his wife home. And second, in Knight, you also had a restriction of liberty, and the court in Knight, I'd invite the court's attention in Knight because Knight says that the affirmative act in that case wasn't allowing Mr. Knight to rely upon the police to take her home. The affirmative act was detaining the two of them and then releasing Mr. Knight, and you don't have any of that here. The one claim that I do want to address, the swap of the calls for a moment. The pardon? Because that's something. The what did you say afterwards? Maiden taking the case. Mr. Maiden allegedly switching assignments with another social worker because that's something else. Well, we have to assume that happened because it's in the complaint. We have to assume that. Your Honor, respectfully, I don't think for purposes of summary judgment that you do, and let me explain why. The only thing that Ms. Heimbaugh bases her assertion that that happened on is an unverified email from a social worker who investigated the situation who stated that another DHS worker told her that she was at a meeting and this happened at the meeting, and I submit that that's not competent evidence. There was certainly opportunity during discovery in this case to depose other persons at the meeting to establish that that switch happened. Let's assume it happened. Would that make the legal situation different? No, Your Honor, it wouldn't at all. It's a routine administrative act that occurs probably in the course of many rescue attempts. Make sure a caseworker gets sick and somebody else takes care of it. Absolutely. We cannot. I don't think that we could base liability on the fact that there was a switch in caseworkers, even if requested by the caseworker. So at least that doesn't concern me. It might concern other members of the panel. Yes, and I'd be happy to address it further. I mean, I think not only is it just routine every day, it's also not a deprivation of liberty. It's not a restriction on anyone's liberty to just for two caseworkers to switch cases, and the happenstance that now the bad worker has the case when otherwise the good worker would have had the case simply. And we don't even know that. Yes. You mean that there are good workers? Well, of these two, either one of them would have done anything. Well, Your Honor, I mean, there's not evidence in the record that social workers routinely disregarded something like a 24-hour deadline, and as you can see, it was taken very seriously by DHS and investigated here. So respectfully, I would take issue with that kind of representation. Go ahead. If there are no further questions on the case with respect to the estate, I'll move on to the Alexis Bennett cases. What do you see as the difference in the legal issue in the cases? Because I've been assuming it's essentially the same legal issue, but counsel have said, no, it isn't, and I'd like to know what, since you're defending both of them, what do you see as the different legal issues in the cases? The cases are only different legally in the sense that they're asserting that different facts satisfy the Affirmative Act requirement of the State Created Danger Theory. But of course she wasn't born in 2000. Yes, so she couldn't have a claimant's respect. For her to make a claim on the basis of the closure and not the closure due to misrepresentation. Yes, Your Honor, and I'll also point out that it's our contention that Alexis can't make that claim either because you have to prove conscious, shocking, deliberate indifference, and Alexis had been in the custody of their father, and there's no evidence in the record that anyone at DHS knew that she was now in the custody of the mother. So therefore, even assuming that other elements of the case would establish a conscious disregard for the other children's safety, there's no evidence that there would have been a conscious disregard for her safety because for all they knew, she was still in the custody of the father. So let me go back to the question that I think you were answering. The legal difference in the cases? Question mark? What do you see as the legal difference in the cases? The legal issue. They're both Affirmative Act cases. They're both Affirmative Act cases, and they're based on different alleged actions or, as I would contend, inaction by DHS. They're both inadequate rescue cases but inadequate rescue for different reasons that are proclosed by the shamee. And I submit that the easiest way to resolve the Alexis Bennett case is to rely upon the point that it's completely speculative to assume that the child advocate would have been the private source of rescue here. And that's something that's essential to their case because it's the only thing that would distinguish this case from the shamee. Otherwise, as inadequate as the court may think the efforts were to find the children here, all you have is the shamee. You have a failure at DHS to rescue the children themselves. And where there's a total absence in the record of any evidence that the child advocate took any action to search for them, even after objecting to closure of the file the first time, I submit that there can't be a finding that there was a prevention of rescue here. And I'd also submit that there's an alternative reason for finding that DHS's representations to the child advocate couldn't constitute an affirmative exercise of authority to prevent rescue. And that's what plaintiffs really... Mr. Colton tries to characterize this as a misrepresentation, that the children can't be found. And we do dispute that point. But one thing I'd point out is that in the Yee case, it was assumed for purposes of summary judgment that the doctor's assertion to his patient that, go home, you'll be fine, don't worry, was also a misrepresentation. And the court held in that case that that misrepresentation wasn't actionable because it didn't result in a deprivation of Mr. Yee's liberty to go to an emergency room, that there has to be something akin to a restriction of liberty. And they go back to the DeShaney case and say, because that's an animating principle of substantive due process, and that's what we're talking about in this case is a substantive due process. Mr. Colton said that he finds the crucial issue here is you cannot use deliberate misrepresentation to obtain closure of a dependency file. Is that a constitutional violation? No, Your Honor. I would say it's not. First of all, I'd say there's no misrepresentation in saying... Well, even if there is, even if there is, it is a deliberate use of misrepresentation to end a dependency. Not custody, but a dependency relationship. Is that a constitutional violation? No, Your Honor. It's not. And if it isn't, do we then have any remedy that as a federal court we can provide? No, Your Honor. I don't think you do. And as I said, I think it all stops at the point that there was actually no prevention of rescue in this case. Wow, that's factual. It all flows from there. But it's only a factual issue if Mr. Colton can raise a reasonable inference that the child advocate would have rescued them. Well, you very quickly said no, and I didn't think you would say yes, when Judge Roth asked you, is the deliberate use of a misrepresentation to end the dependency relationship a constitutional violation? And you said no. I mean, you know, I would have been astonished if you had said yes. But I guess the real question should be, are there any cases by this court or the Supreme Court that say that it's not a constitutional violation? It's a different... Yes. No, I don't think there's any case either way, except like I said... So you said yes quickly, but the question could be the Congress, and then you would have had to say no. There's no precedent that says that it isn't a constitutional violation. And then so the next question Mr. Colton will ask is why shouldn't it be a constitutional violation? So you can answer the question he didn't ask, but then I'm asking. Sure. Well, as I was pointing out, the misrepresentation wasn't what did it for the court in Yee. It wasn't enough. And I'd also point out that it's not, you know, coming back to the restriction of liberty issue, DHS's assertion to the court, Mr. Colton said it can't be analogized to an assurance, but I submit that it can be. The representation is the children cannot be found.  And the child advocate thereby relies upon that representation and doesn't search themselves, according to Mr. Colton, which is I've said there's no evidence that the child advocate would have gone out and done more anyway. So there's two things. It's the fact that a misrepresentation isn't what constitutes... Well, but there's been no factual hearing on that, so we don't know whether the child advocate's office could get up and say, look, our file shows, or we know from experience, that John Smith, one of our child advocates, always gives out and looks at all possible places to find the children. And there was this lead, and they were getting welfare money, and so obviously it was going somewhere, so a grandmother or a great-grandmother had the children. So I don't know that we can answer it on that basis. That would work for me at the 12B6 stage, but we've had discovery in this case, and Mr. Colton had the opportunity to do that, and he was unable to deduce that sort of evidence, that there has to be something to support a reasonable inference by the jury. And as I said, I submit that's a really important thing in this case because that's what would distinguish it from DeShaney. And I'd like to take the last couple minutes I have, if I may, to just move on and cover a couple points on municipal liability because I believe that the court doesn't have to reach the constitutional issue and can also just resolve it on municipal liability. What Mr. Colton relies upon, the sole thing that he relies upon, is the closed case project, which is a project that Commissioner Martinez undertook in the wake of this case to try to make DHS do things better. And she created a new database and new search procedures and reexamined cases where children were missing from a period of January 2000 to September 2003. And they had social workers go out and redo the searches, and they did find all but 20 of 152 children. And Mr. Colton submits that that makes out a municipal liability claim, and for several reasons I submit that it doesn't. As an initial matter, we're talking about the wrong time period, and that's something that I didn't emphasize in my brief that I'd like to put across to the court because what he has to prove is that our policymakers were on notice in April of 2000 that we had a problem with inadequate search procedures for children. And this data covers the wrong period. It's 152 cases from January 2000 to September 2003. I submit that that doesn't establish that as of April 2000 we were on notice, that we had an unacceptable number of children who had gone missing, and that we could have found them. You can't really tell us that if it were a different time, earlier time period, that you wouldn't have an equivalent number of missing children. I was born in this city. I went to school in this city. I know what happened. I've been here for more years than I'm going to tell you. And I can't believe that it would make a difference if you shifted the time period a year or six months. That's not a telling argument, really. But I think it's a difficult inference to draw, Your Honor. If one else says it's not what happened,  Yes, our deliberate indifference to what happened. I was born in Philadelphia, too, but I got out of town as soon as possible. This is another problem. As I've explained, when the social workers went back, they went back with new search procedures. We did what we're supposed to do. We were not deliberately indifferent. When we were on notice, this was a problem. We undertook to find new procedures. All I'm saying is I can't believe that they weren't on notice that there was a problem before. Because if I go back and look at it, and I don't have the time to do it, but I'm sure some researcher can go back and say there's been a problem. Look, this child was missing, and this happened here, and this happened there. All I'm saying is it's not a telling argument to me, at least. I think that everybody knows, and it's not only here, it's a comparable agency in New Jersey that has had similar problems. It's an endemic problem of how a municipal entity deals with what we can call children in the underclass who are missing or abandoned, and the parents are druggies. I mean, we know this happens, so I don't care. Frankly, I don't care whether he put it on the record or not. We know it. There is knowledge throughout every large municipality, and even every small municipality, who knows it's a problem. The question is what kind of liability you put on the agencies that have the responsibility to care for this. I mean, that's the issue. And I don't know the answer. No, you're going to have more time to answer. I'd just like to make two more brief points about municipal liability. I would submit that you have Bryan County to follow. You have to find a direct causal link. There's generally a problem with children in the underclass in this city, and that's not sufficient to establish an O'Neill violation. You have to prove we were doing something inadequate, and we were deliberately indifferent to the fact that individuals were doing something that inadequate. And I'd submit that that's another problem with using this data to make the determination that we were deliberately indifferent before, because when we utilized new search methods, we went back and found these children. I think that's proof that what Commissioner Martinez did worked. It's not proof that back in April 2000 we were deliberately indifferent. And just one further point on municipal liability, because it's a subtle point. I'm not sure that I made it well in my brief as well. I submit that a pattern of inadequate searches, and Judge Slaughter, I know this is going through what's bothering you about this case, but a pattern of inadequate searches doesn't establish a pattern of something that's of constitutional magnitude. So even assuming it's established, it's – Well, that's right, because there's no showing that the Constitution requires adequate searches. Yes. And, I mean, I've gone over these arguments. I mean, sure, you can't – if you get a 911 call and they don't answer it and somebody dies, do you hold them liable? And the answer always is you cannot impose on a municipality the responsibility to take care of all of the people out there, even if you know that they're in trouble. I think the shame is more than that, Your Honor. I mean, I think it's saying it's not the court's responsibility, it's not – the Constitution isn't imposing those duties. The legislature's imposing those duties. The mayor's imposing those duties. The commissioner of DHS is imposing those duties. And if the voters don't like how they're overseeing those duties that are handled, then they can vote if someone else – And the courts are frustrated. And I understand that frustration. I also just wanted to make sure that you understand my point that even establishing a pattern of inadequate searches here is inadequate. It's not what would have caused a constitutional violation here. It's a pattern of behavior that we're morally obligated to act to respond to, but it's not something that we're obligated by the Constitution to respond to, and that we're obligated by Section 1983 to respond to. Section 1983 doesn't impose any liability. It just provides a vehicle for the liability that other provisions of the Constitution. Yes, I'm just speaking as it's been defined to impose a duty on the city to remedy the constitutional violations of individuals. Okay. If the court doesn't have any further questions. Joe, you've been quiet. You're not of Philadelphia. Do you have any questions, comments? No, I have no questions. I'm impressed with the seriousness of the problem that you've all explained, I think. You have it in Pittsburgh, too? I'm afraid so. And in Wilmington. All the parts of the Third Circuit. Okay, thank you. Thank you. Okay, Ms. Himelbach. I'm sorry. That's okay. So what can you tell us? I just want to make a couple of brief points. One, even setting aside the job switch, the assignment switch, setting that aside, Mr. Maiden made decisions. The making of a decision is an affirmative act. He made the decision despite the fact that he knew he was supposed to under DHS policies in a non-discretionary way, supposed to go out and do this. He decided, no, I'm not going to do that. The making of that decision of, no, I'm not going to do what I'm responsible and obligated to do as a public servant made him an affirmative act. It means he should have been fired and maybe prosecuted, but how does it mean that the city is liable? Well, again, it's an affirmative act, and I would argue that under Rivas v. City of Passaic it would be taken cumulatively. This would satisfy the fourth prong showing an affirmative act. Does it have to be a conscious, shocking, conscious, shocking affirmative act? Well, it has to be a conscious, shocking affirmative act, and I think we certainly rise to that level here. I don't want to get into an argument at this point of the sliding Lewis scale and what is conscious, shocking. So what concerns me is in determining whether it's conscious, shocking, do you look at the outcome or do you look at the act itself? You look at the act itself. Because isn't there conscious, shocking, bureaucratic ineptitude around this in every step we take dealing with municipalities? Well, let's hope not every municipality in every step. In this particular situation, I have to agree with you. As far as municipal liability and getting to that point, it's our position that they have a policy, regardless of the fact that their written policy says, well, yeah, supervisors have to timely check back with the social workers to make sure that they did their job. The pattern and the practice, which was developed during depositions through Tom Salinski, who's the head training people there, was that supervisors don't check back for up to 10 days. The second aspect of municipal liability is the coding issue. This was pursuant to policy, DHS policy, coded as a GPS, which is a neglect call, as opposed to CBS, which is an abuse call. Now, during the depositions of Mr. Salinski, we discussed, well, what makes it an abuse versus neglect call? And the response was, well, normally if someone has a black eye or a swollen eye, that would be considered abuse, but unless the reporter actually states that they saw the abuse, it's considered neglect. Now, that is the practice and policy of DHS. That is outrageous. But whether it was classified as neglect or abuse at the ranking of two, it would require action within 24 hours. However, the fact is that neglect calls, by the very nature of their being neglect, which generally means a failure to thrive, failure to provide food, don't have the same urgency as a GPS or an abuse call. So those who have negligence in miscoding, but I'm not sure why that presents a constitutional violation. I don't see this as negligence at all. They deliberately decided to code and act as a negligence call despite the evidence of physical abuse simply because in their determination, arbitrarily decided, well, unless the reporter says I actually saw him beating on her, it's going to be neglect. That's arbitrary. That's outrageous. That has no relationship to the fact that there was physical abuse. I have to tell you that your red light's on. Thank you. Thank you. Just a few points. The ZZE case, which I know Ms. Phan worked on, although that was an assurance case, the court was very specific in how it characterized that assurance. On page 641 of that decision, the court says that, let's be clear, that an assurance, in this case, an expression of intent to help is not an affirmative act. So the court characterized what the doctor did in the ZZE case as an expression of intent to help. Now, to you and me, it might sound like what the doctor said was a misrepresentation of present fact. He said something like, you're fine, go away. But the court was clear to characterize that as an expression of intent to do help in future. I didn't say that right. Which is not the case here. Because with my case, it was not an expression of intent to help. It was a misrepresentation to obtain closure of the case. The deliberate use of a misrepresentation to end a dependency court case will always have the consequence that the child advocate unit will no longer, or whoever the lawyer is for the child, will no longer represent the child and will no longer look for the child as they're required to do by state statute. Ms. Isfrat said, did I pronounce that right? Yes. Okay. She said that you had an opportunity in discovery to show that the child advocate would have done more and you didn't put that on the record. How do you answer that? Page 532 of the record is page 42 of Tanel's deposition. He testified that the child advocate unit would also go out their social workers. Each case has a social worker who works for the child advocate unit assigned to the case, but they would also go out and look for families. We also put on the record... But they hadn't done so in the six months between the two dependency hearings. We have no evidence because they destroyed their file. So we can't prove one way or the other. We have no evidence they did, but there's no evidence that they didn't. Yeah, but wasn't that your burden? If you're saying that they prevented assistance, wasn't it your burden to show there would have been assistance? Yes, Your Honor. I think we've met that burden by showing we have an expert report that says this is how it works. They go out and look for kids if the case is open, if there's a dependency court open. Once the dependency court case is closed, everybody's reassigned. I just want to ask you about the time before the closing. In the six months, when the ACU objected to the closing... We don't have a burden to show that they searched before. We only have a burden of showing that there was a chance that they would have searched after. But if six months had gone by and they didn't search... It doesn't necessarily mean they wouldn't have searched after. That's like saying just because they were negligent before, they were always going to be negligent. No, but when you have a summary judgment, you have to come forward with the evidence. Well, the jury couldn't infer from evidence of past practice on other cases and how they handle cases and the state duty that's imposed by statute. Anthony Turnell testified this is how they handle things. This was probably an aberration that they didn't search before. The presider has the unfortunate responsibility of telling you that your red light is on. Thank you, Your Honor. Thank you. You can tell by our questions. It's a matter of grave concern. I don't know that we as judges can resolve what is essentially a societal problem. But we'll take it under advisement and we'll see what we can find. Thank you. Thank you all. Joe, is that all right with you? Yes. Okay, I'll just miscounsel. I have to ask everybody that because Judge Wise is dealing with us this way, he can come to chamber. So we're going to lock him. Please leave the courtroom. We're going to confer in the courtroom because we have the video here. That's law clerks too. And Michael, you stay outside the door and we'll knock when we're ready to emerge. Thank you all. That's law clerks, interns, everybody.